## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| TYSHIEM BROWN and COREY MITCHELL, <br><br> Plaintiffs, <br><br> v. <br><br> THE TOWN OF SCARBOROUGH, NEXGEN HOSPITALITY INC. (d/b/a Comfort Inn & Suites of Scarborough), JATT ESTATES, LLC (d/b/a Comfort Inn & Suites Scarborough Portland), INSTA CHOICE LLC, and CHOICE HOTELS INTERNATIONAL, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    Docket No. 2:24-cv-00366-NT |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Plaintiffs Tyshiem Brown and Corey Mitchell bring this suit[1] against the Town of Scarborough and four entities related to the Comfort Inn & Suites hotel chain. The Plaintiffs allege that the Defendants violated federal and state law by discriminating against them in housing based on their race and status as public assistance recipients. The Town of Scarborough now moves to dismiss the amended complaint for failure to state a claim (ECF Nos. 11 & 47). For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

---

[1]    The Plaintiffs originally filed two separate civil actions, which are now consolidated. *See* Order (ECF No. 46); *see also Mitchell v. Scarborough*, No. 2:24-cv-00367-NT (D. Me. 2024). The Town of Scarborough filed separate but substantially identical motions to dismiss in each docket. Now that the cases are consolidated, this order resolves both motions to dismiss.

## BACKGROUND

### I.    The Plaintiffs' Tenancy at the Comfort Inn

The Plaintiffs are two Black men who lived at the Comfort Inn & Suites in Scarborough, Maine (the "**Comfort Inn**") from 2021 to 2023 during a period when they were otherwise unhoused. Compl. (Inj. Relief Requested) ("**AC**") ¶¶ 12, 17–19 (ECF No. 2-5). The Plaintiffs paid for their lodging with a federal housing benefit called Emergency Rental Assistance ("**ERA**"). AC ¶¶ 15, 19. At that time, the Comfort Inn was renting exclusively to ERA recipients who, like the Plaintiffs, were otherwise unhoused. AC ¶ 23.

During the Plaintiffs' tenancy, the Comfort Inn housed seventy-eight tenants. AC ¶ 24. Approximately 18% of tenants identified as Black, and approximately 57.7% identified as White. AC ¶ 24. By contrast, from 2017 to 2021, around 0.2% of Scarborough's population was Black, and around 91.7% of the population was White. AC ¶¶ 27, 30. During the relevant period, 25.9% of Black Scarborough residents were living at the Comfort Inn and were otherwise unhoused, compared to 0.2% of Scarborough's White residents. AC ¶ 29.

From 2017 to 2022, people identifying as non-Hispanic Black or African American constituted 1.4% of Maine residents and 2.1% of residents of the Portland metropolitan area. AC ¶¶ 25–26. In January of 2022, approximately 35% of people experiencing homelessness anywhere in Maine identified as Black. AC ¶ 28.

### II.    Scarborough's Refusal to Renew the Comfort Inn's License

Under Maine law, the Town of Scarborough ("**Scarborough**" or the "**Defendant**") has authority over whether hotels may operate in the municipality.

AC ¶ 35; 30-A M.R.S. § 3812. By statute, Scarborough's town council (the "**Town Council**") functions as the "licensing board" responsible for "the issuance of innkeepers' [ ] licenses." 30-A M.R.S. § 3812(1); AC ¶ 36. Under that authority, the Town Council can issue, deny, or revoke hotel licenses, and it can also impose "any restrictions and regulations that it considers necessary" on licensees. *Id.* § 3812(3)(A)(2).

By law, hotel licenses expire after one year. *Id.* § 3812(4). Scarborough generally requires hotels to undergo public hearings to receive a first-time license, but it does not require hearings for license renewals, which are typically treated as "a routine act." AC ¶¶ 35–36. However, in May of 2022, Scarborough required multiple hotels, including the Comfort Inn, to undergo public hearings before their licenses would be renewed. According to Scarborough, it required those hearings because of safety concerns, citing its "perception of increased emergency services calls." AC ¶¶ 37–38. According to the Plaintiffs, the number of such calls was not "substantially different" from previous years. AC ¶ 37.

At a public hearing on May 18, 2022, Scarborough declined to renew the Comfort Inn's license. AC ¶ 38. Over the following months, Scarborough convened multiple Town Council meetings that involved public commentary on the topic. AC ¶ 39. At those meetings, community members expressed safety concerns while also making statements that reflected stereotypes based on race and about low-income people. AC ¶ 41. Scarborough proposed that, as a condition of license renewal, the Comfort Inn should hire continuous onsite security and an onsite licensed social

worker. AC ¶ 40. For months, the Comfort Inn tried unsuccessfully to "appease" the Town Council and obtain a renewed license without committing to the proposed requirements. AC ¶ 42. But the Town Council continued insisting on those requirements, despite evidence from several parties—including Scarborough's police and fire chiefs, the ERA program director, and a Comfort Inn security guard—that safety concerns "were being adequately addressed." AC ¶ 40.

### III. The Comfort Inn's Evictions and Refusal to Accept ERA Funds

Finally in September of 2022, fearing loss of its business license, the Comfort Inn proposed that it would evict all current tenants and stop accepting ERA funds as rental payment. AC ¶¶ 42, 46. On those conditions, the Town Council voted to renew the Comfort Inn's license. AC ¶ 43. The Defendant and the Comfort Inn did not discuss alternative, less intrusive means by which the hotel could address the Town Council's safety concerns, such as by evicting only those renters who violated hotel policies or caused undue emergency services calls. AC ¶ 44. The Comfort Inn also agreed to give periodic updates to the Town Council about the hotel's compliance with the conditions imposed on its license, and the Town Council reserved the right to schedule a license revocation hearing if the Comfort Inn failed, by a set deadline, to evict all tenants and stop accepting ERA funds. AC ¶ 43. Around this time, other hotels in Scarborough also stopped accepting ERA as rental payment. AC ¶ 47.

Approximately five months later, in February of 2023, the Comfort Inn evicted all current tenants, including the Plaintiffs. AC ¶¶ 48, 50–51. Given the lack of other affordable housing options in Scarborough, and because of various town ordinances that prohibit camping, temporary lodging, and the construction of homeless shelters,

the Plaintiffs could not find new housing in Scarborough. Both Plaintiffs had to leave Scarborough and are still unhoused. AC ¶¶ 52–59.

## IV.    The Amended Complaint

In October of 2024, the Plaintiffs filed the amended complaint now before me. They allege that Scarborough—by renewing the Comfort Inn's license on the condition that the hotel evict all tenants and stop accepting ERA funds— discriminated against the Plaintiffs based on their race and their status as public assistance recipients. The Plaintiffs allege thirteen[2] federal and state law causes of action under: (1) the federal Fair Housing Act ("**FHA**"), 42 U.S.C. §§ 3601–3614 (Counts 2, 5, & 7); (2) the fair housing provisions of the Maine Human Rights Act ("**MHRA**"), 5 M.R.S. §§ 4581–83 (Counts 1, 3, 4, & 6); (3) a Maine statute requiring municipalities to "affirmatively further" certain fair housing objectives, 30-A M.R.S. § 4364-C (Count 8); and (4) the U.S. and Maine Constitutions (Counts 10–14).

Scarborough then moved to dismiss the amended complaint under Federal Rule of Procedure 12(b)(6) for failure to state a claim. Def. Town of Scarborough's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("**Mot.**") (ECF No. 11).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

---

[2]    The amended complaint originally stated fourteen causes of action, including negligence under Maine law. *See* Compl. (Inj. Relief Requested) ("**AC**") ¶¶ 102–04 (ECF No. 2-5). I do not consider the negligence claim in this order because the Plaintiffs now concede that it should be dismissed as to the Town of Scarborough. *See* Pl.'s Obj. to Mot. to Dismiss 13 (ECF No. 26).

on its face." *Thornton v. Ipsen Biopharms., Inc.*, 126 F.4th 76, 80 (1st Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quotations omitted). Plausible means something more than "merely possible" or "merely consistent with a defendant's liability." *Germanowski v. Harris*, 854 F.3d 68, 71–72 (1st Cir. 2017) (citations and quotations omitted). To decide a motion to dismiss, I follow two steps. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citation omitted). First, I distinguish the complaint's factual allegations, which I accept as true, from its conclusory legal statements, which I disregard. Second, I decide whether the facts support a "reasonable inference" of the defendant's liability. *Id.* (citation and quotations omitted).

## DISCUSSION

In Section I, I address the Plaintiffs' claims of housing discrimination based on race and receipt of public assistance in violation of federal and state law (Counts 1–7). In Section II, I consider their claim under a Maine law that obligates municipalities to further fair housing objectives (Count 8). Finally, in Section III, I turn to their claims under the U.S. and Maine Constitutions (Counts 10–14).

## I.    Housing Discrimination Under Federal and State Law (Counts 1–7)

Racial housing discrimination is prohibited by both federal and state law. Under the FHA, it is unlawful (i) "make unavailable or deny[ ] a dwelling to any person" because of race; or (ii) "discriminate . . . in the terms, conditions, or privileges of sale or rental of a dwelling" because of race. 42 U.S.C. § 3604(a), (b). Similarly, under the MHRA, it is unlawful for any person with the right to "sell," "rent," or

"manage" housing accommodations to take the following actions based on race: (i) "refuse to sell, rent, lease, let or otherwise deny" housing accommodations; (ii) discriminate in the "price, terms, conditions or privileges" of a housing sale, rental, or lease; or (iii) "[e]vict or attempt to evict any tenant." 5 M.R.S. § 4581-A(1)(B), (D), (E).

Housing discrimination based on the receipt of public assistance is prohibited only by state law. The MHRA makes it unlawful for "any person furnishing rental premises or public accommodations" to "refuse to rent" or "impose different terms of tenancy" on a tenant "primarily because of" their status as a recipient of federal, state, or local public assistance, including "housing subsidies." 5 M.R.S. § 4581-A(4).

Under the MHRA, "[u]nlawful discrimination" includes not only direct violations of a nondiscrimination provision but also "[a]iding, abetting, inciting, compelling or coercing" a violation. *Id.* § 4553(10)(D).

The Plaintiffs allege racial and public assistance discrimination under two theories: disparate treatment and disparate impact. The Defendant moves to dismiss on the grounds that (A) it cannot be held liable for actions taken by the Comfort Inn; (B) the Plaintiffs fail to properly allege any theory of racial discrimination; and similarly, (C) the Plaintiffs fail to properly allege any theory of public assistance discrimination. For the following reasons, I find that all three arguments fail.

### A.    The Defendant's Liability for the Comfort Inn's Conduct

The Defendant makes a threshold argument that it cannot be liable for racial or public assistance housing discrimination arising from actions taken by the Comfort

Inn, which was the entity directly responsible for evicting the Plaintiffs and "decid[ing]" not to accept ERA funds. Mot. 7.

I disagree. As to discrimination under federal law, the FHA does not limit liability to landlords. Instead, it prohibits any conduct, regardless of the actor, that "make[s]" housing "unavailable" or that discriminates in housing "terms, conditions, or privileges" based on race. 42 U.S.C. § 3604(a), (b). That statutory language " 'refers to the consequences of an action rather than the actor's intent' " and is " 'results-oriented.' " *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 35 (D. Mass. 2023) (quoting *Tex. Dep't of Hous. & Cmt'y Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 534 (2015)). To that end, the FHA's implementing regulations recognize liability for any conduct that " '*results in* a discriminatory housing practice.' " *Id.* (quoting 24 C.F.R. § 100.7(a)(1)(i)).

As to discrimination under state law, while the MHRA is narrower than the FHA in that it limits the actors who may be directly liable, *see* 5 M.R.S. §§ 4581-A(1), -A(4),[3] a separate provision broadens the scope of liability by making it a violation to aid, abet, or compel another to engage in unlawful conduct, *see id.* § 4553(10)(D).

Given the language of the three relevant provisions, the amended complaint establishes a basis for the Defendant's liability for both racial and public assistance discrimination. Even if it was the Comfort Inn, and not the Defendant, that directly evicted tenants and decided to stop accepting ERA funds, the amended complaint

---

[3]     *See* 5 M.R.S. § 4581-A(1) (prohibiting racial discrimination only by those with the "right" to "sell," "rent," or "manage" housing accommodations); *id.* § 4581-A(4) (prohibiting public assistance discrimination only by those who "furnish[ ]" public accommodations).

plausibly alleges that the Defendant pressured the Comfort Inn to do so. It is therefore plausible that the Defendant's conduct "resulted" in a racially discriminatory housing practice and that the Defendant at least "aided" the Comfort Inn's discrimination based on race and public assistance, which is enough to support the Defendant's liability for housing discrimination under the FHA and MHRA.

### B.    Racial Discrimination—Disparate Treatment (Counts 1 & 2)

Having resolved that threshold issue, I now turn to the Plaintiffs' FHA and MHRA racial discrimination claims under a disparate treatment theory. Disparate treatment means intentional discrimination. *See Vanderburgh House, LLC v. City of Worcester*, 530 F. Supp. 3d 145, 154 (D. Mass. 2021). The Plaintiffs' theory is that when the Defendant pressured the Comfort Inn to evict all tenants and stop accepting ERA funds, it was motivated in part by the tenants' race. In moving to dismiss the disparate treatment claims, the Defendant argues that the amended complaint is "devoid" of any allegations showing that the Defendant was motivated by race.[4] Mot. 5. However, this argument overlooks the Plaintiffs' multiple allegations that amount to circumstantial evidence of discriminatory intent.

"Because discriminatory intent is rarely susceptible to direct proof," plaintiffs frequently establish disparate treatment through circumstantial evidence. *Mhany*

---

[4]    The Defendant also argues it cannot be liable for disparate treatment because its conduct was motivated by safety concerns. Def. Town of Scarborough's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("**Mot.**") 7 (ECF No. 11). But disparate treatment does not require the Plaintiffs to prove that the Defendant's actions "rested *solely* on racially discriminatory purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (emphasis added) (involving equal protection claims). Instead, they need only show that race "played a role" in the Defendant's conduct, even if it did not "figure in solely, primarily, or even predominantly." *Vanderburgh House, LLC v. City of Worcester*, 530 F. Supp. 3d 145, 154 (D. Mass. 2021) (citation omitted).

*Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016). That circumstantial evidence may include the "sequence of events leading up to the challenged decision," "[d]epartures" from a defendant's ordinary procedures, and whether the action "bears more heavily on one race than another." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977) (citations and quotations omitted).[5] Discriminatory intent may also be established where racial animus "is a significant factor in the community opposition" to which municipal actors are responding, *Vanderburgh House*, 530 F. Supp. 3d at 154–55 (citation omitted), or where the defendant's nondiscriminatory justification is "unsupported by objective evidence." *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 109 (D. Mass. 2010) (citation and quotations omitted).

Here, the Plaintiffs allege that (1) the Defendant departed from standard procedures by requiring the Comfort Inn to undergo public hearings to renew its license, citing a "perception" of increased emergency services calls that was unsupported by objective evidence, AC ¶¶ 36–38; (2) the Defendant continued citing safety concerns despite evidence of the Comfort Inn's concrete steps to improve the issue, AC ¶ 40; (3) during the relevant period, ERA recipients living at the Comfort Inn and people experiencing homelessness throughout Maine were

---

[5]    *See also Macone v. Town of Wakefield*, 277 F.3d 1, 6 (1st Cir. 2002) ("[P]rocedural abnormalities can provide a basis for finding discriminatory intent . . . within a larger scope." (quoting *Arlington Heights*, 429 U.S. at 267); *Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 373–74 (D. Mass. 2022) (denying a motion to dismiss FHA claims based in part on a town's departures from standard zoning procedures); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (holding in the equal protection context that disparate impact can be circumstantial evidence of intentional discrimination).

disproportionately likely to be Black, AC ¶¶ 24–30; (4) at public meetings, community members made comments reflecting racial stereotypes, AC ¶ 41; and (5) after months of refusing to do so, the Defendant renewed the Comfort Inn's license only when the hotel offered to stop accepting ERA funds, AC ¶¶ 42–43. Together, this circumstantial evidence supports a plausible inference that race at least partially motivated the Defendant's conduct.[6]

The Defendant also moves to dismiss on the grounds that the Plaintiffs fail to identify any similarly situated people or groups who were treated more favorably, which the Defendant asserts is required of disparate treatment claims. According to the Defendant, because "*all* tenants" were evicted from the Comfort Inn regardless of race, there was necessarily "no similarly situated person . . . who was treated differently[.]" Mot. 6. But the First Circuit recently stated in the equal protection context that "a relevant comparator is not necessarily a requirement" to establish disparate treatment. *Wadsworth v. Nguyen*, 129 F.4th 38, 54 (1st Cir. 2025); *id.* at 72 (Rikelman, J., concurring) ("[E]vidence that similarly situated individuals received preferential treatment . . . is just one way to prove intentional discrimination."). Along similar lines, the Eleventh Circuit considers it "perfectly logical" not to require Title VII plaintiffs to produce comparator evidence because, as in the case before me, "a

---

[6]     *Cf. Vanderburgh House*, 530 F. Supp. 3d at 154–55 (denying a motion to dismiss FHA disability discrimination claims given evidence that the city was "at least partially motivated by pressure from residents to prevent the operation of sober houses in the neighborhood"); *Valentin*, 633 F. Supp. 3d at 377 (denying a motion to dismiss an FHA race discrimination claim, noting that "[i]t has long been established by the Supreme Court that the state cannot base decisions depriving black persons of housing as a result of the discriminatory intent of private citizens").

proper comparator simply may not exist." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

In any event, at the pleading stage, the Plaintiffs are not required to allege facts to satisfy any single element. Their burden is to allege facts that "in sum" make the claim "at least plausible." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14–15 (1st Cir. 2011). Here, they meet that burden even without comparator evidence.

## C.    Racial Discrimination—Disparate Impact (Counts 4–7)

Next, I consider the Plaintiffs' racial discrimination claims under a disparate impact theory. Whereas disparate treatment focuses on intent, disparate impact focuses on conduct that, while not intentionally discriminatory, nonetheless has a "disproportionately adverse effect" on a protected group and is "unjustified by a legitimate rationale."[7] *Louis*, 685 F. Supp. 3d at 37 (quoting *Inclusive Cmtys.*, 576 U.S. at 524). Disparate impact liability may arise if the challenged conduct either (1) "actually or predictably" has a disproportionate effect on a racial group, or (2) "creates, increases, reinforces, or perpetuates segregated housing patterns." 24 C.F.R. § 100.500(a). The Plaintiffs allege disparate impact based on both types of racially discriminatory effects.

---

[7]    It is well-established that both disparate treatment and disparate impact theories are cognizable for racial discrimination claims under the FHA, and I assume the same is true of the MHRA's analogous provisions. *See Macone*, 277 F.3d at 5 ("To prove a violation of the [FHA], appellants can show either discriminatory intent or disparate impact."); *Saint Pierre v. NFG Hous. Partners LP*, No. 2:21-cv-00300-GZS, 2023 WL 6378029, at *6 (D. Me. Sept. 29, 2023) (MHRA claims "are generally subject to the same standards and interpretations as their federal analogues").

### 1.     Disproportionate Effect (Counts 6 & 7)

As to the first type of discriminatory effect, "a wide enough contrast between the way a policy burdens members of a protected group as opposed to non-members is cognizable as a disparate impact." *R.I. Comm'n for Hum. Rts. v. Graul*, 120 F. Supp. 3d 110, 125 (D.R.I. 2015) (collecting cases). The Plaintiffs allege that during the relevant period, people experiencing homelessness in Maine were disproportionately Black. AC ¶ 28. This allegation supports the inference that the same was true of individuals receiving ERA funds, which in turn makes it plausible that any policy targeting ERA recipients would disproportionately impact Black renters. The Plaintiffs also allege that Black Scarborough residents were overrepresented among Comfort Inn residents compared to their proportion of the town's overall population, which supports the inference that a policy of evicting all Comfort Inn tenants disproportionately burdened Black renters. AC ¶¶ 24–27, 29. Taken together, these statistics are sufficient to allege a disproportionate racial effect.[8]

The Defendant's primary argument[9] for dismissing the disparate impact claims focuses on the reliability of the Plaintiffs' statistical evidence. For example,

---

[8]     *Cf. R.I. Comm'n for Hum. Rts. v. Graul*, 120 F. Supp. 3d 110, 126 (D.R.I. 2015) (concluding at summary judgment that plaintiffs stated an FHA disparate impact claim where group members were "more than three times as likely to be adversely impacted" than non-members); *Moody v. Related Cos., L.P.*, 620 F. Supp. 3d 51, 58 (S.D.N.Y. 2022) (plaintiffs could allege FHA disparate impact by alleging that "the pool of affordable housing residents" was "so overwhelmingly" comprised of minority group members that the policies "necessarily" had a disproportionate impact on those groups "writ large").

[9]     The Defendant also suggests it cannot be liable for disparate impact because any racially disproportionate effect was caused by the correlation between race and homelessness, a problem that, according to the Defendant, "may call for a legislative solution." Mot. 11. On the contrary, "[i]t does not matter" if the Defendant "did not create" longstanding wealth inequities "that have contributed to racial and income disparities." *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 41 (D. Mass. 2023).

the Defendant argues that the cited statistics are misleading given the small size of Scarborough's Black population. Mot. 11. But those arguments about proof are not relevant on a motion to dismiss, particularly because measuring impact is a fact-bound issue better addressed with the benefit of a fuller record.

### 2.    Perpetuation of Segregation (Counts 4 & 5)

Conduct that "perpetuates segregation and thereby prevents interracial association" may give rise to an FHA disparate impact claim regardless of whether that conduct also has a "disparate effect on different racial groups." *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *Inclusive Cmtys.*, 576 U.S. at 540 ("[T]he FHA aims to ensure that [government] priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation."). The First Circuit has not addressed this type of disparate impact liability in the FHA context. As with disparate impact claims based on disproportionate effect, I assume that a plaintiff states a disparate impact claim based on the perpetuation of segregation by showing a disparity between (1) the degree of racial segregation caused by a defendant's conduct, and (2) the degree of segregation that would exist in its absence. *Cf. Graul*, 120 F. Supp. 3d at 125.

Here, as discussed above, the Plaintiffs allege facts to support the inference that the challenged conduct disproportionately impacted Black renters. They also allege that Black residents were already underrepresented in Scarborough compared

---

Liability may arise if the Defendant "rel[ied] on those inequities" and that reliance "ha[d] a disparate impact on housing opportunities" for Black renters. *Id.*; *see also Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 152 (2d Cir. 2025) (disparate impact arises even where disparities "flow[ ] from underlying socioeconomic disparities across races" that the defendant "did not create").

with their representation in the greater Portland metropolitan area and in Maine. AC ¶¶ 25–27, 31. Finally, they allege that around the same time as the challenged conduct, other Scarborough hotels also stopped accepting ERA funds, and that after the Plaintiffs were evicted from the Comfort Inn, they were unable to find other affordable housing in Scarborough and eventually left the municipality. AC ¶¶ 47, 52–58. Together, these allegations make it plausible that the Defendant's conduct, by decreasing housing opportunities in Scarborough for ERA recipients, also decreased housing opportunities for Black renters, which perpetuated the patterns of racial segregation that already existed. That is a plausible claim of disparate impact based on the perpetuation of segregation.[10]

In moving for dismissal, the Defendant asserts that the Plaintiffs' claims do not challenge a municipal zoning ordinance, unlike several out-of-circuit perpetuation-of-segregation cases. Mot. 8–10. The Defendant does not clearly explain the legal significance of this distinction. As I understand it, the distinction likely influences the *degree* to which the challenged conduct perpetuates segregation—presumably, a zoning ordinance that applied to all of Scarborough would have the potential to impact segregated housing to a greater extent than the practices of a single hotel. But as already noted, measuring impact is a question of proof that comes later in the litigation, not on a motion to dismiss. At this stage, the Plaintiffs plausibly

---

[10]      *Cf. Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 619–20 (2d Cir. 2016) (zoning decision restricting multifamily homes perpetuated segregation by decreasing housing available to a racial group that was only 4.1% of the population); *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 641 (D. Md. 2019) (plaintiffs stated FHA claims by presenting data showing that a bank's practice of neglecting foreclosed properties in nonwhite neighborhoods "forestall[ed] housing integration and fr[oze] existing racial segregation patterns").

allege that the Defendant's conduct decreased housing available to Black renters in an already racially segregated municipality, which amounts to an allegation that the conduct perpetuated segregation.

### 3.    Nondiscriminatory Justification

Finally, the Defendant argues that the Plaintiffs' disparate impact claims fail because, as reflected in the amended complaint, the Defendant's conduct was motivated by safety concerns. According to the Defendant, the Plaintiffs therefore fail to plead "the absence of an adequate justification," which is an element of disparate impact. Mot. 12; *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 604 (D. Mass. 2020) ("[D]isparate impact liability is based on . . . discriminatory impact . . . and the absence of an adequate justification."). This argument fails because justification is a requirement at summary judgment, not on a motion to dismiss. *Cf. Louis*, 685 F. Supp. 3d at 38 & n.9 (rejecting defendants' attempt to require "justification" allegations at the pleading stage).

Accordingly, the Plaintiffs' race-based disparate impact claims may proceed.

### D.    Public Assistance Discrimination (Counts 1, 3, 4, & 6)

The Defendant also moves to dismiss the Plaintiffs' MHRA public assistance discrimination claims, which the Plaintiffs allege under disparate treatment and disparate impact theories.

### 1.    *Dussault v. RRE Coach Lantern Holding, LLC*

As a threshold matter, the Defendant makes the overarching argument that, under the one case interpreting the relevant MHRA provision, a defendant cannot be liable for discontinuing a *voluntary* policy of renting to public assistance recipients.

16

*See Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, 86 A.3d 52. But *Dussault* is distinguishable in several key respects. In *Dussault*, a prospective tenant alleged violations of the MHRA after a Scarborough landlord refused to accept vouchers issued under the federal Housing Choice Voucher Program ("**Section 8**"). 2014 ME 8, ¶¶ 4–9, 86 A.3d 52. In siding with the landlord, Maine's highest court reasoned that the landlord had not refused to rent to the plaintiff "primarily" because of her "status" as a recipient of public assistance, as required by the MHRA, but rather to avoid Section 8's onerous administrative requirements. *Id.* ¶ 17.

Here, by contrast, there are no allegations that the Comfort Inn stopped accepting ERA funds to avoid burdensome paperwork. Instead, the Plaintiffs plausibly allege that the Comfort Inn was pressured into refusing ERA funds by the Defendant's Town Council and that the hotel feared it would otherwise lose its license. The Plaintiffs also allege that the Defendant wanted the Comfort Inn to stop accepting ERA funds at least in part because of stereotypical beliefs about low-income people. Given these key distinctions, *Dussault* does not require dismissal of the Plaintiffs' public assistance discrimination claims, at least at this early stage of the proceedings.

### 2.    Disparate Treatment (Counts 1 & 3)

Having addressed that threshold matter, I consider the Defendant's substantive arguments for dismissing the Plaintiffs' public assistance discrimination claims under a disparate treatment theory. The Defendant's primary argument is that its conduct was motivated by safety concerns, not the intent to discriminate based on tenants' receipt of public assistance. Mot. 7.

17

Importantly, the MHRA's prohibition against *public assistance* discrimination is narrower than its prohibition against discrimination based on *race*. The former only prohibits actions taken "primarily because of" a person's "status" as a public assistance recipient. 5 M.R.S. § 4581-A(4). Even accounting for this narrower scope of liability, the Plaintiffs have plausibly alleged that the Defendant aided the Comfort Inn in refusing to rent to them or in imposing different terms of tenancy on them intentionally and "primarily" because of the Plaintiffs' status as public assistance recipients. The same facts discussed above as circumstantial evidence of racial discrimination also serve as circumstantial evidence of discrimination based on public assistance: the Defendant deviated from its usual licensing procedures based on a "perception" of increased emergency services calls unsupported by the evidence; community members made public comments about safety that also included stereotypes about low-income people; and the Defendant renewed the Comfort Inn's license only when the hotel offered to stop accepting ERA funds, suggesting that the Defendant at least acquiesced to community members' discriminatory preferences.

At this early stage, these allegations sufficiently state public assistance discrimination claims based on disparate treatment.

### 3.    Disparate Impact (Counts 4 & 6)

It is unclear whether the MHRA's provision on public assistance discrimination gives rise to disparate impact liability at all. In *Dussault*, the Law Court expressly held that disparate impact claims were not actionable under the MHRA's public assistance discrimination provision based on the landlord's refusal to accept Section 8 as a rental payment. 2014 ME 8, ¶ 26, 86 A.3d 52. But as discussed

above, the factual record in this case is distinguishable from the one before the Law Court in *Dussault*. Accordingly, I assume for the purposes of this motion that the Plaintiffs' public assistance disparate impact claims are actionable. The parties will be free to dispute that assumption as the case progresses.

Because the Plaintiffs allege that the Defendant's conduct exclusively harmed ERA recipients and had no effect on tenants who did not rely on ERA funds to pay for lodging, the amended complaint plausibly alleges a disproportionate effect on public assistance recipients. The corresponding claims therefore survive dismissal.

## II.    Failure to Further Fair Housing in Violation of Maine Law (Count 8)

The Defendant also moves to dismiss the Plaintiffs' claim under 30-A M.R.S. § 4364-C, which requires municipalities to "ensure that ordinances and regulations are designed to affirmatively further the purposes of the [FHA] . . . and the [MHRA] to achieve the statewide or regional housing production goal." 30-A M.R.S. § 4364-C. That section cites to 5 M.R.S. § 13056, which requires Maine to establish "regional housing production goals" to "increase[ ] the availability and affordability of all types of housing in all parts of the State." 5 M.R.S. § 13056(9).

The Plaintiffs seem to assume that if the Defendant's discriminatory conduct violated the FHA and MHRA, then it necessarily violated Section 4364-C as well. *See* AC ¶¶ 99–100. The Defendant's sole argument for dismissal is that Section 4364-C does not provide a private right of action. Mot. 13. The Plaintiffs respond that even if the statute does not expressly provide such a right, one "is clearly implied" by the legislative history and overall statutory structure. Pl.'s Obj. to Mot. to Dismiss ("**Opp'n**") 12 (ECF No. 26); *see Wawenock, LLC. v. Dep't of Transp.*, 2018 ME 83, ¶ 5,

187 A.3d 609 (under Maine law, a statute may provide a private right of action either "by express language or by implication").

The Defendant has the better argument. Courts are "hesitant to imply a private right of action" under Maine law if the legislature has not "expressly stated" that one exists. *Deane v. Cent. Me. Power Co.*, 2024 ME 72, ¶ 34, 322 A.3d 1223 (quotation and citation omitted). Absent express language, courts look to "legislative intent, expressed either in the statute or the legislative history" to determine if the statute implies a private right of action. *Id.* (quoting *Charlton v. Town of Oxford*, 2001 ME 104, ¶ 15, 774 A.2d 366). If the statutory language alone does not confer a private right of action, courts "look to other indicia of legislative intent, such as the location and operation of the statute in the overall statutory scheme, and its legislative history." *Id.*

Those factors do not shed much light on the question. While Section 4364-C's language does not suggest any legislative intent to imply a private right of action, nor does it suggest the intent to preclude one. Similarly, it appears that neither the existence nor the absence of a private right of action would have much impact on the broader statutory scheme. Finally, the Plaintiffs do not point to any specific legislative history showing that Maine's legislature meant to allow private citizens to sue municipalities for falling short of the housing production goals set by the state.[11]

---

[11]    Citing the act that introduced 30-A M.R.S. § 4364-C, the Plaintiffs assert that a private cause of action is "clearly implied by the emergency nature of the bill." Pl.'s Obj. to Mot. to Dismiss 12 (ECF No. 26). But without more, the words "urgent," "emergency," and "immediately" do not overcome the general presumption that when the legislature wants to create a private right of action, it generally will do so explicitly. *See Deane v. Cent. Me. Power Co.*, 2024 ME 72, ¶ 34, 322 A.3d 1223.

Given that ambiguity, and particularly because Maine's highest court has not had the opportunity to consider the issue, I decline to construe an implied private right of action in Section 4364-C. *Cf. Deane*, 2024 ME 72, ¶ 38, 322 A.3d 1223 (declining to construe an implied private right of action "[i]n the absence of express statutory language or clear legislative intent"); *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 101 (Me. 1984) (had the legislature intended to create a private right of action, "it would have either expressed its intent in the statutory language or legislative history or, more likely, expressly enacted one").

The Plaintiffs' Section 4364-C claim is therefore dismissed.

## III.    Violations of the Federal and Maine Constitutions (Counts 10–14)

Finally, the Defendant moves to dismiss the Plaintiffs' claims under the U.S. and Maine Constitutions. The Plaintiffs allege violations of the Fourteenth Amendment's Equal Protection and Due Process Clauses, U.S. Const. amend. XIV, § 1 (Counts 13 & 14); and the Maine Constitution's Equal Protection, Due Process, and Civil Rights Clauses (Counts 10–12), Me. Const. art. I, § 6-A.[12]

The federal constitutional claims are actionable under 42 U.S.C. § 1983 ("**Section 1983**"), "which allows individuals to 'sue certain persons for depriving them of federally assured rights' under color of state law." *Fincher v. Town of Brookline*, 26 F.4th 479, 485 (1st Cir. 2022) (citation omitted). The state claims are actionable under the Maine Civil Rights Act ("**MCRA**"), 5 M.R.S. §§ 4681–85, which

---

[12]    The relevant provision states: "No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof." Me. Const. art. I, § 6-A.

provides a private cause of action for violations of Maine or federal law by any person, "whether or not acting under color of law." 5 M.R.S. § 4682; *Andrews v. Dep't of Env't Prot.*, 1998 ME 198, ¶ 23, 716 A.2d 212 (citing the MCRA as the vehicle for bringing Maine constitutional claims).[13]

To plead a Section 1983 claim, the Plaintiffs must allege that (1) the Defendant acted under color of state law; and (2) its conduct violated a federally protected right. *Pike v. Budd*, 133 F.4th 74, 83 (1st Cir. 2025); 42 U.S.C. § 1983. Only the second element is in dispute. Accordingly, I consider whether the Plaintiffs plausibly allege that the Defendant's conduct violated the Fourteenth Amendment's Equal Protection and Due Process Clauses. The success of the federal claims under Section 1983 will in turn determine whether the state constitutional claims under the MCRA may proceed. *See Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA." (citation omitted)).

## A.    Equal Protection and Civil Rights Claims (Counts 11, 12, & 14)

The Plaintiffs' equal protection theory is identical to their theory of racial housing discrimination under the FHA and MHRA. *See* Opp'n 18 (asserting that the Defendant's "misuse of its municipal powers" affected Comfort Inn tenants, who were "disproportionately Black," differently than Scarborough's "other residents, who [were] primarily [W]hite"). When a government actor engages in racially

---

[13]    The Defendant moves to dismiss the Plaintiffs' state and federal constitutional claims as "'untethered to any state or federal enabling statute.'" Mot. 14 (citation omitted); *see also* Mot. 15–16. This argument fails. First, the Plaintiffs expressly cite 42 U.S.C. § 1983 as a basis for jurisdiction. AC ¶ 5. Second, though the amended complaint does not cite 5 M.R.S. § 4682, "the failure to cite the proper statute is not fatal . . . at the pleading stage." *Jones v. Hanna*, No. 14-2346, 2016 WL 11781884, at *1 (1st Cir. Mar. 28, 2016) (citing *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) (per curiam)).

discriminatory behavior that violates the FHA, "such conduct also violates the Equal Protection Clause." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 502 (9th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 265–66); *cf. White v. Vathally*, 732 F.2d 1037, 1039 (1st Cir. 1984) ("[T]he analytical framework for proving discriminatory treatment . . . is equally applicable to constitutional and to Title VII claims." (citations omitted)).

My prior conclusion that the Plaintiffs' statutory race discrimination claims survive dismissal means that their federal and state equal protection claims also survive. *Cf. Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 374 (D. Mass. 2022) (complaint plausibly alleged both FHA and equal protection violations given evidence that the town council "effectuated" community members' discriminatory intent "by raising procedural hurdles" to thwart an affordable housing project in a predominantly white neighborhood); *Ave. 6E*, 818 F.3d at 504 (using one standard to assess the plausibility of disparate treatment claims under the FHA and the Equal Protection Clause); *see also Carrier v. Sec'y of State*, 2012 ME 142, ¶ 22 n.7, 60 A.3d 1241 (stating that the federal and Maine Equal Protection Clauses "are coextensive").

The Plaintiffs assert a separate cause of action under what they call the Maine Constitution's "civil rights clause." However, the Plaintiffs do not explain how their claim under the "civil rights" clause differs from the other two state constitutional claims, nor do they cite any authority recognizing a standalone cause of action. That claim is dismissed.

## B.     Substantive Due Process Claims (Counts 10 & 13)

The Due Process Clause prohibits any state actor from depriving a person of "life, liberty or property without due process of law." U.S. Const. amend. XIV. "Substantive due process refers to whether the government has an adequate reason for taking a person's protected interest."[14] *Freeman v. Town of Hudson*, 849 F. Supp. 2d 138, 153 (D. Mass. 2012) (citing *Daniels v. Williams*, 474 U.S. 327, 337 (1986)).

Ordinarily, parties may not use the Due Process Clause "to involve federal courts in the rights and wrongs of local planning disputes" because local entities are usually "closer to the situation and better equipped to provide relief." *Valentin*, 633 F. Supp. 3d at 375 (quoting *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992)). However, the First Circuit has left the door "slightly ajar" for such claims in "truly horrendous situations," such as where the challenged conduct "shocks the conscience and violates the decencies of civilized conduct." *Id.* (quoting *Nestor*, 964 F.2d at 45 (citation modified)). For example, state action may shock the conscience where plaintiffs allege "fundamental procedural irregularity," "racial animus," or "violation of a fundamental principle." *Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 69 (D. Mass. 2013) (quoting *Clark v. Boscher,* 514 F.3d 107, 113 (1st Cir. 2008)) (quotations omitted). Along those lines, the First Circuit has suggested that substantive due process violations may arise where the

---

[14]     I assume that the Plaintiffs' due process claims involve a "protected interest" in housing at the Comfort Inn, which the parties do not dispute. *See Macone*, 277 F.3d at 9 ("To establish a due process claim, substantive or procedural, [plaintiffs] must first establish a property interest." (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972)); *see also Aponte-Rosario v. Acevedo-Vilá*, 617 F.3d 1, 9 (1st Cir. 2010) ("[a]ssuming" that plaintiffs had "a protected property interest in the form of an expectation to remain in their public housing units").

24

government acts with "discriminatory intent." *Macone v. Town of Wakefield*, 277 F.3d 1, 9 (1st Cir. 2002).[15]

      Against this high standard, the facts supporting the Plaintiffs' substantive due process claims are lean. But given the alleged irregularities in the hotel licensing process and the inference that the Defendant's conduct was at least influenced by racially discriminatory intent, it makes sense to let these claims proceed. Discovery will overlap with the other surviving causes of action, and it will be more appropriate to determine the viability of these claims together and on a fuller record.

      The Plaintiffs' federal and state due process claims therefore survive dismissal. *See Northup v. Poling*, 2000 ME 199, ¶ 9 n.5, 761 A.2d 872 ("The due process rights guaranteed by the Maine Constitution, Me. Const. art I, § 6-A, are coextensive with those guaranteed by the Fourteenth Amendment of the U.S. Constitution.").

---

[15]    *Cf. Valentin*, 633 F. Supp. 3d at 375–76 (substantive due process claim survived dismissal given allegations that town officials deviated from normal zoning procedures and acquiesced to racially motivated community opposition); *Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 69 (D. Mass. 2013) (substantive due process claims survived dismissal where plaintiffs "ha[d] done enough, at this stage in the proceedings, to distinguish their allegations from the sort of 'run of the mill' land-use claims often brought by disappointed developers and rejected by federal courts").

## CONCLUSION

For the reasons set forth above, the Defendant's motion to dismiss (ECF Nos. 11 & 47) is **GRANTED** as to Counts 8, 9, and 12, and **DENIED** as to Counts 1–7, 10, 11, 13, and 14.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 22nd day of August, 2025.